## In re Werblun

*C. Brewster Rhoads*, for Committee of Censors.
*Henry M. Stevenson*, for respondent.

PER CURIAM, April 15, 1935.—On February 4, 1935, a rule was entered by the court upon the above-named respondent, Arthur S. Werblun, to show cause why he should not be disciplined for professional misconduct as set forth in a summary of testimony and report taken before a special committee of the bar association.

It was averred that the respondent had been guilty of unprofessional con-

duct, in that he had formed agreements or understandings with persons known to be members of criminal organizations engaged in conducting extensive unlawful gambling operations, to represent professionally and to defend their subordinate agents and operatives should they or any of them be at any time thereafter arrested and charged with violations of the laws of the Commonwealth against gambling or crimes related thereto; and that the respondent, in pursuance of said agreements or understandings made in advance of said arrests and in contemplation of the future commission of criminal offenses in promoting the operation and unlawful purposes of said criminal organizations, thereafter himself, or by and through his professional associates acting for him, did represent such agents and operatives when brought to hearing and trial in the courts of justice, and did directly or indirectly receive pay for his professional services from the principal members of the said criminal organizations.

The respondent, on February 18, 1935, filed an answer to the said rule, denying categorically all of the averments in the rule entered upon him, and the cause came on for hearing before the court sitting en banc, composed of five President Judges of the Courts of Common Pleas of Philadelphia County.

It appears from the testimony that the respondent, Arthur S. Werblun, received regular retainers of $100 a week from one Mike Duffy, a notorious criminal who was the head of a conspiracy to violate the lottery laws by carrying on what is known as the "numbers game". For this salary of $100 a week, with extra fees in special cases, Mr. Werblun agreed to represent any of Duffy's "writers" and "pick-up men" who might be arrested, charged with the violation of the lottery laws, or who were referred to said Werblun by Duffy; also that the respondent conferred with and gave advice to the said Duffy in other criminal conspiracies carried on by Duffy, the purpose of which was to levy blackmail upon truck drivers or their employers by thinly disguised threats to attack the drivers or their employers and destroy their trucks, unless payments were made to Duffy.

The respondent's testimony as to his employment by Duffy was as follows: "Q. Let us keep to Mike Duffy. You were his personal counsel? A. Yes. Q. What was the nature of your reimbursement? A. At one time he paid me $100 a week. Q. For what services? A. For any legal services he might call on me for. . . . Q. What was this $100 for? A. For anything Mike Duffy might suggest. Let me say that by that I mean this. He was in a peculiar position. He was the type of man never said no so far as I know, and if someone would call him, Mike, I am arrested, charged with such and such a crime and haven't any money to hire a lawyer, will you lend me $50 or $100, he would probably say, 'Go to see Werblun and I will pay your bill.' Q. Then that is what you were being paid $100 a week for, to represent the men that Duffy sent to you for you to represent? A. Yes. Q. They did not retain you, Duffy retained you? A. Yes. Q. And that was at the rate of $100 per week? A. Yes."

Duffy was killed in 1931. The respondent, Werblun, continued to accept retainers from other leading criminals, called "backers", engaged in unlawful lotteries. He represented the Lanzetti brothers, Agnes Stein and David Glass, all well-known criminals carrying on this unlawful lottery and "number game". With respect to each of these persons, the respondent received money from the "banker" and in return represented any subordinate referred to him by the "banker" and the "banker's" credit was good with Mr. Werblun for the fee of any sub-agent of the "banker" who required counsel.

It further appears that Mr. Werblun, the respondent, divided fees in criminal cases with his brother who is not a member of the bar but was admittedly a professional bail procurer.

We are convinced that the respondent sought to conceal his misdeeds above recited, by false and evasive testimony before the investigating committee and by the destruction of account books of his firm. His explanation of the destruction of certain pages of his account book was that they were torn out in anger. But it is rather a singular coincidence that these pages torn from the account book related to his transactions during the period that he was employed by Duffy. There were so many pages torn out of the book by the respondent that it is hardly credible that it could have been done as a result of a sudden burst of anger.

Referring to the operations of Duffy in what is known as the "truck racket", the respondent admitted that he passed upon alleged contracts made by Duffy in relation to this unlawful business. As a matter of fact, the purpose of Duffy's so-called trucking business was to levy tribute on legitimate associations and truck drivers in order to permit the drivers to continue their business.

The extent of the respondent's business operations with Duffy in the "numbers game" appears in the testimony that soon after Duffy died there were 300 cases pending against his "writers" and "pick-up men" and that the respondent undertook to dispose of these.

After Duffy's death there was apparently no falling off from the respondent's practice, as Duffy's place was taken by notorious criminals, as we have above stated: Lanzetti brothers, Agnes Stein and David Glass. It is plain from Mr. Werblun's testimony that he was well aware of the criminal activities of these persons. Yet he continued to represent their subordinates without payment by the latter and looked to the "bankers" for his fee.

Respondent testified as to his professional relations with Agnes Stein, that Agnes Stein was "in and out of my office for possibly 4 or 5 years." Respondent was asked the question: "You say at her instance you represented some people in lottery cases. What do you mean? A. I think upon some occasions she came in and asked me if I would represent so and so and paid my fee. Q. How many occasions? A. I would not know. Q. How many defendants? A. I don't know. Q. Well, they were her pay-off and pick-up men? A. I don't know. Q. You were not interested to inquire? A. Mr. Fox, I was not, frankly, and I felt . . . that she would probably say 'Well, what do you care, I am paying.' "

We are here referring to Mr. Werblun's testimony taken before the special committee, and offered in evidence before the trial court.

At the hearing, the respondent testified as follows:

"Q. Mr. Werblun, you testified before the special committee of the bar association, did you not? A. Yes, sir. Q. What you testified to there was true? A. Yes, sir."

We may at this point state that in the sworn answer of the respondent he denied such unprofessional conduct or connections with persons carrying on these criminal operations, so that the respondent's testimony under oath before the committee and before the court was contradictory to his sworn answer.

As we have hereinbefore recited in some detail the connection of the respondent with criminals who were operating lotteries known as the "numbers game" and other criminal activities and as all of the testimony taken on the hearing before the court is filed of record, it is not here necessary to fur-

ther review in detail the relations of the respondent to the principals in these unlawful lotteries.

We are of opinion that the respondent, Arthur S. Werblun, is guilty of professional misconduct, that he has violated the canons of professional ethics adopted as rules of conduct for members of our bar, and that the respondent, Arthur S. Werblun, should be disbarred.

### Decree

And now, April 15, 1935, upon consideration of the rule entered by the court and after hearing thereon, it is ordered that the rule be made absolute and that said respondent, Arthur S. Werblun, be and is hereby disbarred from practicing at the bar of Courts of Common Pleas, the Orphans' Court and the Municipal Court of the County of Philadelphia, and that his name be stricken from the roll of attorneys.

Notice of this order to be given by the prothonotary to the Supreme and Superior Courts of Pennsylvania, the several Courts of Common Pleas, the Orphans' Court and the Municipal Court of the City and County of Philadelphia.